## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | Case No. 2:21CR00001 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **JULIO CHAVEZ and GERMAN** | ) | JUDGE JAMES P. JONES |
| **HERNANDEZ,** | ) | |
| | ) | |
| Defendants. | ) | |

*Daniel J. Murphy, Assistant United States Attorney, Abingdon, Virginia, for United States; Matthew L. Felty, Abingdon, Virginia, for Defendant Julio Chavez; Randy V. Cargill and Benjamin M. Schiffelbein, Assistant Federal Public Defenders, Roanoke, Virginia, for Defendant German Hernandez.*

In this criminal case, the defendants, federal prison inmates, have filed motions to suppress incriminating statements made by them without being advised of their *Miranda* rights. After hearing and based upon my factual findings and the applicable law, I will deny the motions on the ground that the defendants were not in custody as contemplated under *Miranda*.

### I.

### A. BACKGROUND.

The defendants, Julio Chavez and German Hernandez, are charged by Indictment with conspiring to commit murder, in violation of 18 U.S.C. § 1117, and

attempting to commit murder, in violation of 18 U.S.C. §§ 2, 1113.  The defendants have filed motions to suppress statements made to prison officers on January 21, 2020, as part of an investigation into a stabbing that occurred on January 15, 2020, at United States Penitentiary Lee (USP Lee).[1]  Specifically, the defendants challenge statements attributed to them in an Inmate Investigative Report, which was compiled by Special Investigation Services (SIS) Agent Jamie Canfield following his investigation of the incident.  Gov't Ex. 1, ECF No. 105-1, at 24, 25.  The defendants contend that because they were not given *Miranda* warnings, their statements are inadmissible.  The government argues that the defendants were not in custody for *Miranda* purposes and the warnings were therefore not required.

The Fifth Amendment states, "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  To guarantee the protection of this right, it is well-settled law that prior to a custodial interview of a suspect, law enforcement officers must provide that individual with *Miranda* warnings.  *United States v. Miranda*, 384 U.S. 436, 444 (1966).  The requirement for *Miranda* warnings is triggered only when there is "custodial interrogation."  *Id.* The custody inquiry turns on whether a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave."  *Howes v. Fields*,

---

[1]  The defendants have each filed a motion to suppress and given the overlap of the factual and legal issues, I have considered the motions together.

565 U.S. 499, 509 (2012) (citation omitted).

The Supreme Court has held that the *Miranda* rule is applicable in the prison context. *Mathis v. United States*, 391 U.S. 1, 4 (1968). However, "imprisonment alone is not enough to create a custodial situation within the meaning of *Miranda*." *Howes*, 565 U.S. at 511. Custody in the prison context "necessarily implies a change in the surroundings of the prisoner which results in an added imposition on his freedom of movement." *United States v. Conley*, 779 F.2d 970, 973 (4th Cir. 1985) (citation omitted). Accordingly, a "different approach to the custody determination is warranted." *Id.*

Whether an inmate is "in custody" is based on the totality of the circumstances surrounding the interrogation and whether the inmate was subjected to "more than the usual restraint." *Id.* Relevant factors include the purpose of the interrogation, the degree of constraints normally present in the prison facility, the physical surroundings of the interrogation, the length of the interrogation, the extent to which the inmate is confronted with evidence of guilt, the relationship between the law enforcement officer and the individual inmate, and the use of any additional pressures to detain the inmate in the situation. *Id.* at 973–74; *United States v. Cooper*, 800 F.2d 412, 414 (4th Cir. 1986); *Cervantes v. Walker*, 589 F.2d 424, 428 (9th Cir. 1978).

In *Conley* and *Cooper*, the Fourth Circuit emphasized that the defendants had been taken to rooms for purposes other than interrogation, noting that the reason for the questioning is particularly relevant to the custody analysis. *Conley*, 779 F.2d at 973–74; *Cooper*, 800 F.3d at 414. In *Cervantes*, the Ninth Circuit similarly stressed that the *Miranda* rule should not operate to interfere or disrupt prison administration. 589 F.2d at 427. Where the questioning's primary purpose is related to prison administration, such as safety and security at the prison, it cuts against *Miranda* custody. *Conley*, 779 F.3d at 973; *United States v. Willock*, 682 F. Supp. 2d 512, 533 n.26 (D. Md. 2010).

Evidentiary hearings were held on the motions on October 27, 2021, and October 29, 2021. The sole witness was SIS Agent Canfield. His Inmate Investigative Report was also introduced, without objection, as Government Exhibit 1, ECF No. 105-1.

## B. FINDINGS OF FACT.

The following are my findings of fact as to the motions to suppress. In determining the credibility of Agent Canfield, I have considered the rationality and internal consistency of his testimony, the extent of detail and coherent nature of the testimony, the manner of testifying by the witness, and the degree to which the testimony is consistent with the other evidence in the case.

1.     The defendants are currently incarcerated at USP Lee.  On January 15, 2020, the defendants and three other co-defendants charged in the Indictment were involved in the stabbing of another inmate that was captured on the prison's security video system.  Agent Canfield suspected that the incident was gang related.  Both defendants are members of Mara Salvatrucha 13, also known as MS-13, and the victim is a member of the Mexican Mafia, another prison gang.  Shortly after the incident, other fights broke out throughout the facility between MS-13 members and the Sureños, a gang that is an ally to the Mexican Mafia.  MS-13 usually pledges allegiance to the Mexican Mafia, and the Sureños are considered the foot soldiers of the Mexican Mafia.

2.     Following the incidents, USP Lee went into a facility-wide lockdown, as is the standard protocol following such matters.  Identified members of the gangs were relocated to separate housing units.  MS-13 members were specifically relocated into a single housing unit within the facility — the "G" housing unit.  During lockdown, all the USP Lee inmates were confined to their cells.  If inmates had to leave their cell for any reason, they were escorted with their hands in restraints behind their backs.

3.     The SIS unit at USP Lee immediately launched an investigation regarding whether there was a larger dispute between the three gangs: MS-13, the Mexican Mafia, and the Sureños.  Canfield was concerned that the accord between

MS-13 and the Mexican Mafia had ended and that more violence was possible. At the same time, similar investigations were being conducted throughout the Bureau of Prisons (BOP), as there was concern that the prison gangs' dispute extended beyond USP Lee.

4.      The SIS is tasked with investigating security incidents that occur at the facility. During the SIS investigation, a total of 36 inmates were interviewed, including all known MS-13 members. Canfield and SIS Technician Paul Necessary conducted the MS-13 interviews, with SIS Lieutenant Corey Davis coming in and out of the interviews. Canfield and Necessary were both wearing standard corrections officer gear, including handcuffs, keys, radio, and pepper spray, but neither individual carried a firearm.

5.      To conduct the interviews, an SIS technician would escort each inmate in hand restraints from his cell to the interview room. Each interview was intended to last approximately five to fifteen minutes. Canfield intentionally kept every interview to approximately the same length to avoid an implication that any inmate was cooperating. Each inmate was generally asked the same or similar questions about the January 15 incident, the events that led up to the incident, and whether a conflict between the groups would be an ongoing issue. Canfield wanted to collect as much information as possible to better understand whether the various gang

members could safely interact with each other, both at USP Lee and throughout the BOP.

6.      Agent Canfield interviewed defendant Chavez on January 21, 2020, at approximately 9:45 a.m., and defendant Hernandez on the same day at approximately 11:30 a.m.   Canfield did not advise the defendants or any other inmates of their *Miranda* rights.   He did not provide *Miranda* warnings because his concern was primarily whether the inmates were going to cause more issues if they were released back into the general population.   He also did not inform the defendants that they were free to terminate the interview at any point.

7.      In his interview, defendant Chavez stated, "[w]e have tried to fix the disrespect issues from Zaragoza [the stabbing victim] but no one wanted to hear it and didn't want to change, so we fixed it.   We have crossed a line that can't go back. We know what we did, this is how it needed to be."   Gov't Ex. 1, at 24, ECF No. 105-1.   When asked if MS-13 would have attacked any member of the Mexican Mafia, he stated, "[a]ny of them that got in the way."   *Id.*   The Inmate Investigative Report also attributed paraphrased statements to defendant Chavez:   "MS-13 no longer wanted to associate with the Mexican Mafia or Sureno [sic] inmates and they wish to stand as their own group"; "[T]hey would walk any yard regardless of who else was on the yard but they (MS) would strike first regardless of numbers or the

consequences"; and "[H]e did not feel there was any way to fix this issue nor did he express any desire to fix the issues between the groups." *Id.*

8.      The same paraphrased statements are also attributed to defendant Hernandez:  "MS-13 no longer wanted to associate with the Mexican Mafia or Sureno (sic) inmates and they wish to stand as their own group"; "[T]hey would walk any yard regardless of who else was on the yard but they (MS) would strike first regardless of numbers or the consequences"; and "[H]e did not feel there was any way to fix this issue nor did he express any desire to fix the issues between the groups." *Id.* at 25.

9.      The interviews were conducted in an empty dayroom located off the common area of the "G" housing unit.  The room did not contain any furniture, so both the interviewers and the inmate remained standing during the entire interview. The room was approximately ten feet by twenty feet wide with a single entrance. The door remained closed but unlocked during the interviews.

10.     There were two, and at most three, interviewers, in the room when the defendants were interviewed.  As with all the interviews, both the interviewers and the inmates remained standing during the entire interview, with the inmates remaining in hand restraints.  Canfield and Necessary asked the defendants the same general questions as every other inmate interviewed, namely about events leading up to the incident and whether moving forward there would be issues between MS-

13 and the Mexican Mafia or Sureños.  Both defendants were interviewed for approximately five to ten minutes.  Canfield did not confront the defendants with any evidence of their involvement in the January 15 incident, such as the video recording of the assault.

11.    The primary purpose for the interviews was to collect information about the gang dispute and whether the inmates could safely interact moving forward, although another purpose was to investigate the crime for potential prosecution. Canfield's questions during the interviews were primarily focused on whether MS-13 was breaking its allegiance with the Mexican Mafia.  He questioned all MS-13 members in the same general manner about this issue, not just the individuals he knew were directly involved in the stabbing.  He specifically asked the defendants if the dispute between the gangs could be resolved.  He also interviewed Sureños and Mexican Mafia members, as well as inmates who were not affiliated with any gang, as to overriding issue of prison security.

II.

Based upon the totality of the circumstances, and crediting Canfield's testimony, I find that the defendants were not "in custody" for *Miranda* purposes. The purpose of the interview was primarily about safety and security of the general prison population at USP Lee and throughout BOP facilities, which strongly cuts against this being custodial interrogation.  The questions focused primarily on

whether the dispute between the various gangs could be fixed, and whether the inmates could safely interact if released back into the general population. In other words, these interviews were to support a critical administration function of the prison — inmate and staff safety. Moreover, each of the defendants were questioned for a brief period, approximately five to ten minutes. Even though Canfield knew that the defendants were involved in the incident, having previously viewed the video recording, the record does not indicate that the defendants were ever confronted with any evidence of their guilt or personal involvement in the January 15 incident. Rather, they were questioned in roughly the same manner as all the other inmates during the investigation. Only two or three interviewers were in the room, none of whom were armed, and everyone remained standing during the interview, which inherently created a less coercive environment.

The defendants emphasize the fact that they were restrained, with their hands cuffed behind their back, and confined to their cells without access to common areas. They argue that the government cannot avoid *Miranda* merely by subjecting *all* inmates to the same heightened restrictions. But the level of restraint is just one factor under *Conley*; in other words, restraint on movement is only a "necessary and not a sufficient condition for *Miranda* custody." *Howes*, 565 U.S. at 509 (internal quotation marks and citation omitted). In this case, the level of restraint

does not point strongly in either direction, as the entire facility was locked down and all inmates were subject to the constraints.

Similarly, the defendants argue that the fact that all inmates were questioned in the same manner should not weaken *Miranda*'s protections.  The mere fact that all inmates were interviewed in the same manner, however, is not itself conclusive of the custody determination.  Rather, it provides some context for analyzing the factors relevant to the inquiry — that is, it expounds upon the "nature of the questioning."  *Conley*, 779 F.2d at 974.   Here, the brevity and uniform manner of the questioning are probative of the primary purpose of the questioning and indicate the situation was inherently less coercive, both of which point against *Miranda* custody.

On the other hand, I recognize that the defendants' interviewers were SIS staff, who are tasked, among other duties, with investigating incidents for prosecution.  The defendants were also questioned in a separate location, isolated away from their cells and the general prison population, and they were never advised that they were free to leave the interview.  Each of these factors favor this being custodial interrogation.  Nevertheless, considering all the circumstances, I find that these facts are outweighed by the others, leading to my finding against *Miranda* custody.

III.

For these foregoing reasons, it is **ORDERED** that each defendant's Motion to Suppress, ECF Nos. 83 and 100, is DENIED.

ENTER:   November 15, 2021

/s/ JAMES P. JONES
Senior United States District Judge